# In the United States Court of Federal Claims

|  |  |
|---|---|
| **GAMAL MOSTAFA,**<br><br>    *Plaintiff,*<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>    *Defendant.* | No. 24-1100<br>Filed: March 9, 2026 |

*Jeff T. Schrameck*, Schrameck Law PLLC, Canton, Michigan, for Plaintiff.

*Laura Offenbacher Aradi*, Trial Attorney, *Matthew D. Lewis*, Trial Attorney, *Lisa L. Donahue*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, *Brett A. Shumate*, Assistant Attorney General, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**HADJI,** *Judge***.**

Plaintiff Dr. Gamal Mostafa is a former Chief of Surgery and attending general surgeon at the John D. Dingell Department of Veterans Affairs Medical Center in Detroit, Michigan (Detroit VAMC). ECF 48 ¶ 1. In this action, he alleges that the United States, through the VA, breached the terms of a settlement agreement entered into to resolve a dispute surrounding the revocation of his clinical privileges. *See generally* ECF 11. Plaintiff maintains that the VA's alleged breaches of contract resulted in "lost wages and benefits, including back pay and front pay, in an amount estimated at $500,000 to $1,000,000" in damages. ECF 11 ¶ 77.

In June 2025, both parties moved for summary judgment. *See* ECF 20; ECF 24. The Court orally denied both motions on June 17, 2025, concluding that a trial was necessary to resolve this fact-specific case. *See* Docket, Case No. 24-1100.

A three-day trial was held in Washington, DC, beginning on November 3, 2025. *See* ECF 83 at 1. The witnesses and evidence presented at trial were focused on Plaintiff's sole breach of contract claim. Plaintiff and the Government called two Joint Witnesses: (1) Rebecca Schmidt, Credentialing & Privileging Manager at the Detroit VAMC; and (2) Dr. Raghuram Matta, Chief of Staff at the Detroit VAMC. ECF 67 at 1-2. Plaintiff also called three other witnesses: (1) Dr. Walter Salwen, a Detroit VAMC employee; (2) Christopher Cauley, Director of the Detroit VAMC; and (3) Dr. Gamal Mostafa, himself. ECF 67 at 3.

The Government called only one witness, Amanda Rosas, Senior Strategic Business Partner, also known as Chief of Human Resources, at the Detroit VAMC. ECF 67 at 4.

The central issues before the Court are: (1) whether the VA breached the terms of the Settlement Agreement; and (2) if so, whether the breach(es) caused Plaintiff financial harm. The Court has carefully considered the testimony presented and the exhibits the parties offered into evidence. For the reasons set forth below, the Court finds that the VA did not breach the Settlement Agreement, and that Plaintiff did not adequately prove causation of any alleged damages. The Court therefore directs the entry of judgment for the Government.

## FINDINGS OF FACT

### I.    Plaintiff's Detroit VAMC Employment and Revocation of Privileges

Plaintiff Dr. Gamal Mostafa was born and raised in Cairo, Egypt, where he attended medical school. Tr. 303:2-3 (Mostafa). After graduating from medical school, he trained at the Royal College of Surgeons in the United Kingdom before immigrating to the United States. Tr. 303:3-10 (Mostafa). In the United States, he completed several fellowships and retrained, culminating in becoming a fellow of the American College of Surgeons, a credential he still holds in good standing. Tr. 303:11-14 (Mostafa). Following this training, Plaintiff was appointed to a faculty position at the University of North Carolina in Charlotte, NC. Tr. 303:15-18 (Mostafa).

Plaintiff joined the Detroit VAMC as Chief of Surgery in November 2012. Tr. 304:14-20 (Mostafa). It was a joint appointment, which also included a full professorship at Wayne State University, a promotion from his position at the University of North Carolina. Tr. 303:19-25 (Mostafa). Serving in these roles was personally meaningful for Plaintiff because treating veterans was an opportunity to give back to the nation to which he had immigrated and which had made him a citizen. Tr. 304:8-13 (Mostafa).

Plaintiff was brought into the Chief of Surgery role to help fix issues with the surgical program in the Detroit VAMC. Tr. 304:2-7 (Mostafa). Prior to his arrival, veterans who came in with problems necessitating surgery would often leave without obtaining the necessary surgeries. Tr. 305:9-15 (Mostafa). In the role, Plaintiff dramatically increased the volume of surgeries the Detroit VAMC was performing, transforming its residency program from one nicknamed "VAcation," for its reputation for not doing anything, to a program that staffed the operating room late into the evening treating veterans with urgent needs. 306:15-24 (Mostafa). As Chief of Surgery, Plaintiff managed various administrative responsibilities on top of his active surgical practice. *See* Tr. 307:4-18 (Mostafa). Since August 23, 2021, Plaintiff has not performed any surgery at the Detroit VAMC. Tr. 315:21-316:2 (Mostafa). Around that time, Plaintiff was removed from his post as Chief of Surgery, and he became subject to a series of disciplinary proceedings that led to the present litigation. Tr. 315:5-20 (Mostafa).

2

At the Detroit VAMC, a body called the Clinical Executive Committee[1] handles credentialing and clinical privileging matters. ECF 48 ¶ 9. The Committee is composed of medical staff who serve as voting members according to the Medical Center Bylaws. ECF 48 ¶ 9; DX2002 at 328. Article V, Section 5.02(1)(b) of the Bylaws designates the Committee voting members as follows:

> Deputy Chief of Staff, Associate Chiefs of Staff for Administrative Medicine Service, Diagnostic Radiology Service, Geriatrics & Extended Care Service, Integrated Clinical Services, Medicine Service, Mental Health Service, Pathology & Laboratory Medicine Service, Research Service, Primary Care Service, and Surgical Service. Also the Section Chiefs for Dermatology, Pharmacy, Psychology, Rehab Medicine and Dental.

DX2002 at 328. Indeed, Plaintiff served as a voting member of the Committee when he was Chief of Surgery, *see* Tr. 307:4-8 (Mostafa), a position he held for almost ten years, *see* Tr. 304:14-23 (Mostafa). The Committee holds two types of meetings: regular Committee Meetings and special Committee Meetings. Tr. 127:9-17 (Matta). Regular Committee Meetings deal with granting privileges to new employees or renewing existing employees' privileges, and they are held on a regular basis. Tr. 127:13-128:2 (Matta). Special Committee Meetings are convened on an ad-hoc basis to consider revocation of privileges for providers whose conduct has caused clinical care concerns. Tr. 128:3-10 (Matta). This case deals exclusively with special Committee Meetings. Tr. 168:2-6 (Matta). Specifically, the Court heard testimony about three Committee Meetings: one on October 20, 2022; another on January 23, 2023; and the final and most relevant on June 12, 2023. *See* JX2A; JX3A; JX10A.

The conduct and structure of Committee Meetings are governed by the Medical Center Bylaws. *See* DX2002 at 328-331; *see* Tr. 92:1-9 (Schmidt). But they also appear to be modified by common practice, rather than strict adherence to the text of the Bylaws, according to Dr. Raghuram Matta who has been chairperson of the Committee since December 2021. *See* Tr. 176:15-24 (Matta); Tr. 126:18-127:4 (Matta); *see also* DX2002 at 328 (establishing the Chief of Staff as Chairperson). For example, the Bylaws list several Section Chiefs as voting members, DX2002 at 328, but in practice, a Section Chief is only invited when one of their providers is the subject of a particular Committee Meeting. Tr. 176:7-24 (Matta); 179:17-180:22 (Matta). When the Detroit VAMC's Chief of Staff becomes concerned about the quality of a provider's clinical care, they can summarily suspend the provider's privileges. Tr. 166:11-19 (Matta). After summarily suspending a provider's privileges, the Chief of Staff initiates outside reviews of the relevant clinical

---

[1] The parties and witnesses use the term "CEC" to refer both to the Clinical Executive Committee itself and Committee meetings. For clarity, the Court will use the term "Committee" when referring to the voting body, and the term "Committee Meeting" when referring to a meeting of the Clinical Executive Committee.

cases by independent medical professionals. Tr. 168:16-170:1 (Matta). The Chief of Staff then convenes a special Committee Meeting, where the voting members are presented with the results of the outside reviews, relevant medical records, and any response or evidence submitted by the provider. Tr. 89:2-5 (Schmidt); Tr. 136:7-17; 166:3-10 (Matta). The Credentialing & Privileging Manager circulates these documents prior to the Committee Meeting. Tr. 89:2-5 (Schmidt); Tr. 136:7-17 (Matta). At the end of each Committee Meeting, the voting members vote to make one of three recommendations: (1) privilege revocation, (2) privilege reinstatement, or (3) Focused Professional Practice Evaluation where the provider is closely supervised for a period of time. Tr. 167:6-168:1 (Matta). That recommendation goes to the Detroit VAMC Medical Director, who either approves or disapproves it. *See* Tr. 59:2-19 (Schmidt); Tr. 167:19-23 (Matta).

Committee Meeting attendance by individuals who are not voting members has been a contested question in this litigation. The Court heard conflicting testimony on this point, but ultimately the record indicates that non-voting members regularly attended Committee Meetings. According to Rebecca Schmidt and Dr. Matta—who organized every Committee Meeting and were responsible for inviting guests—staff and guests routinely attended Committee Meetings. *See* Tr. 36:8-37:11 (Schmidt); Tr. 131:25-132:4 (Matta); *see also* Tr. 253:10-20 (Cauley); JX2A at 439; JX3A at 412. By contrast, Dr. Walter Salwen and Plaintiff testified that guests never attended Committee Meetings. *See* Tr. 215:20-22 (Salwen); Tr. 312:23-313:4 (Mostafa). Given Dr. Matta's and Schmidt's central roles in conducting Committee Meetings and determining the list of attendees, the Court finds their testimony more persuasive and concludes that non-voting guests regularly attended Committee Meetings. This conclusion is further supported by the fact that non-voting guests attended all three of the Committee Meetings at issue in this case. Specifically, all three Committee Meetings were attended by Credentialing & Privileging staff to capture the minutes and by at least one VISN 10 employee.[2] *See* JX2A at 439; JX3A at 412; JX10A at 1811; Tr. 37:14-18 (Schmidt).

Plaintiff was the subject of a special Committee Meeting held on October 20, 2022. JX2A at 439. The meeting minutes from that meeting reflect that two individuals, Dustin Fitzpatrick and Dr. Dana Frazer, attended in addition to the regular voting members. JX2A at 439; Tr. 169:7-15 (Matta). Fitzpatrick, a Health Systems Specialist, coordinated the outside reviews of Plaintiff's cases and attended as an ex-officio non-voting member according to the Bylaws. JX2A at 439; *see* DX2002 at 329; Tr. 169:16-170:6 (Matta). Dr. Frazer, VISN 10 Chief Surgery Consultant, attended as a surgery subject matter expert and person familiar with one of the initial outside reviews of Plaintiff's cases. JX2A at 439; Tr. 170:7-17 (Matta). Rebecca Schmidt also attended while training for her new role as Credentialing & Privileging Manager. Tr. 37:14-18 (Schmidt). Nicole Metrusias, another

---

[2] Though it was not explained in detail at trial, the Detroit VAMC is part of Veterans Integrated Service Network (VISN) 10, a network of medical centers and outpatient clinics providing care to veterans in Michigan, Ohio, Kentucky, and Indiana. *See* *VISN 10*, Dept. of Veterans Affairs, https://department.va.gov/integrated-service-networks/visn-10/ (last visited March 9, 2026).

Credentialing & Privileging employee, attended and recorded the minutes. *See* JX2A at 462. After reviewing the relevant evidence, the Committee voted 7-to-5 in favor of recommending that Plaintiff's privileges be reinstated, subject to a Focused Professional Practice Evaluation. JX2A at 462; Tr. 170:23-171:3 (Matta). The Interim Executive Director, Michelle Martin, disapproved the Committee's recommendation and recommended revocation of Plaintiff's privileges. JX2A at 462; Tr. 171:4-8 (Matta).

Plaintiff next went before a special Committee Meeting on January 23, 2023. JX3A at 412. In advance of that meeting, Plaintiff provided materials to Schmidt, which she circulated to the members of the Committee. Tr. 41:2-6 (Schmidt). The meeting minutes reflect that five individuals attended in addition to the regular voting members. JX3A at 412. Fitzpatrick and Dr. Frazer attended for the same reasons as the prior Committee Meeting. JX3A at 412; Tr. 171:22-25 (Matta). Schmidt again attended, supervising creation of the minutes by Metrusias. JX3A at 412, 437; *see* ECF 48 ¶ 12; Tr. 171:25-172:6 (Matta); Tr. 27:10-14 (Schmidt). Dr. Anthony Restuccio, Chief Medical Officer of VISN 10, also attended the meeting. JX3A at 412; Tr. 100:1-9 (Schmidt). This meeting followed much the same process as the October Committee Meeting, with the voting members reviewing an evidence file and response from Plaintiff. Tr. 139:5-25 (Matta). The voting members at the January Committee Meeting voted 9-to-3 to recommend revocation of Plaintiff's privileges, and the Interim Executive Medical Center Director, Amy Kennebeck, approved that recommendation. JX3A at 437; Tr. 145:23-146:7 (Matta).

## II.    Plaintiff's Appeal and Settlement Agreement

Following the January Committee Meeting, Dr. Matta submitted a proposal to remove Plaintiff from employment at the Detroit VAMC. Tr. 146:8-11 (Matta); Tr. 232:13-15 (Cauley). To contest that removal proposal, Plaintiff had the right to appear before the deciding authority to provide both written and oral testimony in his favor. Tr. 146:16-19 (Matta); Tr. 232:16-23 (Cauley). In this case, the deciding authority was Acting Medical Center Director, Christopher Cauley. Tr. 146:12-15 (Matta). Plaintiff met with Cauley on March 15, 2023, to discuss Plaintiff's proposed removal. Tr. 232:16-25 (Cauley). Plaintiff provided Cauley with a written reply (which included PX1001 and PX1016) and oral reply. Tr. 336:22-337:6 (Mostafa); 341:18-342:5 (Mostafa); Tr. 268:10-23 (Cauley). Cauley understood Plaintiff to be providing him with those documents in relation to his potential removal from employment, separate from the privilege revocation process. Tr. 242:21-243:5 (Cauley). Cauley reviewed the January Committee Meeting minutes, Plaintiff's written reply, and Plaintiff's oral reply, but Cauley did not consult Dr. Matta when evaluating Plaintiff's proposed removal. *See* Tr. 234:16-235:13 (Cauley). In the course of considering these materials, Cauley removed one charge against Plaintiff. Tr. 246:13-247:5 (Cauley). Ultimately, Cauley made the decision to remove Plaintiff from employment with the Detroit VAMC. *See* Tr. 235:4-15 (Cauley). Plaintiff was formally removed from his position on April 5, 2023. Tr. 401:21-23 (Mostafa); ECF 48 ¶ 2.

To appeal his removal, Plaintiff initiated an appeal through the Disciplinary Appeals Board (DAB). *See* Tr. 262:15-22 (Cauley); Tr. 145:10-22 (Matta); Tr. 344:21-345:8 (Mostafa). The DAB process led to a settlement agreement between Plaintiff and the VA, executed on June 5, 2023. *See* JX8; Tr. 402:6-15 (Mostafa). The following provisions of that agreement, reproduced here in full, give rise to the various disputes in this case:

I. The Agency hereby agrees as follows:

…

2. The Agency agrees that it will convene the Clinical Executive Committee ("CEC") on (insert date) [sic] for the sole purpose of having it vote on the restoration of privileges for Mostafa. The makeup of the CEC for this purpose will be the normal voting members. Mostafa will be permitted 15 minutes to speak to the CEC prior to said vote. Mostafa understands that the Agency does not control the outcome of this vote, is not guaranteeing any result and that Mostafa waives any right to any cause of action (pursuant to II (1) below) as to the outcome of said vote.

…

4. In the event that Mostafa requests the Agency provide him with employment verification for future or prospective references and/or financial reasons, the Agency agrees to provide employment verification that includes (and is limited to) dates of employment, position title and salary, and the fact that he retired. Mostafa understands that the Agency is only obligated to provide this reference through the Chief of Human Resources Detroit VAMC and that it is Mostafa's obligation to direct any such inquiries to this individual.

…

II. Mostafa hereby agrees as follows:

1. Mostafa hereby releases, forfeits, abandons, dismisses, rescinds, withdraws and waives with prejudice any and all complaints, grievances, appeals, remedies, actions and causes of action, which he now has or may have had, whether known or unknown, arising out of his employment with the Agency, or any other matter, in any forum including, but not limited to, the Disciplinary Appeals Board, State or Federal Courts, the Equal Employment Opportunity Commission, or the Merit Systems Protection Board, up to and including the date upon which this Agreement is executed by Mostafa and for the

6

referenced action in I.3. above; against the Agency, its officers, agents, assigns, and employees, in their individual and official capacities. This Agreement shall not release, waive, or affect adversely in any way the rights or claims that Mostafa may have to vested retirement, pension benefits or other leave benefits.

JX8 at 1636-37. The first two provisions, sections I(2) and I(4), create obligations that Plaintiff alleges were breached. *See* ECF 11 ¶¶ 73-75. And the Government argues that the final clause of Section I(2) and all of Section II(1) serve to waive Plaintiff's ability to raise various pieces of evidence. *See generally* ECF 50.

### III.    The June 2023 Clinical Executive Committee Meeting

In June 2023, Dr. Matta convened a special Committee Meeting to comply with the terms of the Settlement Agreement. JX10A at 1811; *see also* Tr. 173:10-12 (Matta). The conduct of the June Committee Meeting is central to this case, so the facts call for detailed exposition.

Dr. Matta asked Rebecca Schmidt to invite all the regular voting members of the Committee. Tr. 34:20-23 (Schmidt); *see* JX17 at 1809. Dr. Matta also asked Schmidt to invite the following individuals: Dustin Fitzpatrick; Dr. Anthony Restuccio; Nicole Metrusias; Tracy Taylor, VISN 10 Credentialing & Privileging Officer; and Amy Slameka and Nicholas Kennedy, two lawyers for the VA Office of General Counsel. JX10A at 1811; Tr. 96:20-98:25 (Schmidt). In addition, Dr. Louis Furicchia, Interim Assistant Chief of Staff for Diagnostic Radiology Service, was the only regular voting member to attend the June Committee Meeting but not the January Committee Meeting, from which he was excused. *Compare* JX10A at 1811 *with* JX3A at 412.

Schmidt testified that she neither received nor circulated any documents to be considered as evidence at the June Committee Meeting. Tr. 97:9-14 (Schmidt). Generally, the Credentialing & Privileging Manager circulates the evidence file and any documents submitted by the provider prior to the meeting. Tr. 158:18-159:3 (Matta). Dr. Matta testified that no evidence file was prepared and circulated for the June Committee Meeting, because the evidence file was the same as the file circulated for the January Committee Meeting. Tr. 141:8-142:10 (Matta). In March 2023, Plaintiff had provided Christopher Cauley with documents and records he believed had not been shared at the January Committee Meeting. Tr. 336:22-337:6 (Mostafa). Cauley understood Plaintiff to be providing him with those documents in relation to his potential removal from employment, separate from the privilege revocation process. Tr. 242:21-243:5 (Cauley). Plaintiff did not ask Cauley to circulate the documents to the June Committee voting members, nor did Plaintiff provide the documents to Schmidt or Dr. Matta in advance of the June Committee Meeting. Tr. 412:13-22 (Mostafa). Plaintiff also did not present any of those documents during his oral presentation at the June Committee Meeting. Tr. 412:25-413:2 (Mostafa). Ultimately, the Committee voted 9-to-2 in favor of not reinstating Plaintiff's privileges.

JX10A at 1817. Cauley approved that recommendation. JX10A at 1817. Indeed, Cauley testified that he had never disagreed with the doctors' findings from a Committee Meeting. Tr. 275:17-18 (Cauley).

## IV.    The NPDB Report and Employment Verification Requests

Under certain circumstances, VA facilities are required to report adverse credentialing actions to the National Practitioner Data Bank (NPDB), a central repository that tracks such actions. Tr. 101:22-102:2 (Schmidt). As relevant here, VHA Handbook 110.17 reads:

> VHA facilities must file a report with the NPDB … regarding:
>
> …
>
> b. Adverse clinical privileges actions (e.g., restriction, suspension, revocation, etc.) taken against physicians and dentists that are final and affect privileges for more than 30 calendar days, as well as acceptance of the surrender of clinical privileges, or the restriction of clinical privileges of physicians and dentists, when the action is related to professional competence or professional conduct.

DX2001 at 1642-43. Schmidt filed an NPDB Report about Dr. Mostafa on July 12, 2023, based on the permanent revocation of his privileges. JX11 at 60-61; Tr. 49:4-14 (Schmidt). The information in the NPDB report was verified by Dr. Matta and Dr. Jason Pasley. Tr. 52:16-25 (Schmidt).

Prospective employers can make two kinds of requests to the Detroit VAMC: employment verification requests and affiliation verification requests. Tr. 75:19-76:17 (Schmidt). Employment verification requests, addressed in Section I(4) of the Settlement Agreement, involve the HR Department sharing an individual's dates of employment, position title and salary, and the manner in which they completed employment with the VA. JX8 at 1637; Tr. 443:19-444:6 (Rosas). HR Director Amanda Rosas testified that the information required in the Settlement Agreement is the same information she always provides in response to employment verification requests. Tr. 444:23-445:4 (Rosas). *Affiliation* verification requests, which are not addressed in the Settlement Agreement, involve the Credentialing & Privileging Department sharing information on an individual's privileges at the hospital, including the provider's name, dates of affiliation, and active or inactive status of their privileges. Tr. 76:22-77:4 (Schmidt). Schmidt testified that she responded to approximately three affiliation verification requests about Plaintiff. JX15; DX2011; DX2012; Tr. 77:5-9 (Schmidt).

Under the terms of the Settlement Agreement, the Chief of Human Resources is charged with responding to employment verification requests directed to them by Plaintiff. *See* JX8 at 1637. Rosas became Chief of HR in April 2024. Tr. 441:13-19 (Rosas). Rosas was not aware of the Settlement Agreement until October 2024, but she testified that all

8

employment verification responses are limited to the same information listed in the Settlement Agreement. Tr. 441:23-442:9 (Rosas); Tr. 444:23-445:4 (Rosas). Rosas recalled responding to at least two employment verification requests related to Plaintiff without forwarding the requester to Credentialing & Privileging: one from Dr. Rajav Datta (PX1012) and one from Jacqueline Parker. Tr. 456:24-457:7 (Rosas). However, Rosas later testified that she forwarded Dr. Datta to Credentialing & Privileging. *See* PX1012 at 315; Tr. 458:22-24 (Rosas).

## V.      Plaintiff's Subsequent Employment History

When Plaintiff retired from his position as a general surgeon at the Detroit VAMC in March 2023, his total annual salary was $377,164. JX5 at 3308 (Box 12C). By that point, Plaintiff's demotion from Chief of Surgery to general surgeon meant that he had lost a "retention incentive" of an unspecified amount. Tr. 459:3-11 (Mostafa). At that time, Plaintiff was also working as a Wayne State University professor for about $150,000 annually. Tr. 359:16-25 (Mostafa). Plaintiff was terminated from Wayne State in September 2023. Tr. 362:6-15 (Mostafa). Before the Committee Meetings detailed above, Plaintiff had accepted an offer to transfer to a role with the VA in Chicago. Tr. 356:5-7 (Mostafa). He lost that opportunity after his privileges were suspended. Tr. 356:8-12 (Mostafa). After losing his privileges, Plaintiff worked on a per diem basis for Beaumont Health Systems and earned approximately $200,000 in that role between March 2023 and July 2024. Tr. 418:13-19 (Mostafa); *see also* ECF 24-1 at 93 (identifying Beaumont Health Systems' complete name).

In May 2023, Plaintiff received an offer for employment from University of Connecticut Health. *See* PX1006 at 370. The offer included $475,000 in annual base salary. PX1006 at 372. It also included a $20,000 signing bonus and up to $20,000 in relocation expenses. PX1006 at 372. Plaintiff signed this offer. *See* PX1006 at 377; Tr. 387:6-11 (Mostafa). But that offer was rescinded around late November 2023. *See* Tr. 388:1-16 (Mostafa).

In or around November 2024, Plaintiff received an offer for employment from Southern Illinois Medical Services. *See* PX1005 at 336; Tr. 382:3-11 (Mostafa). That offer included guaranteed annual base compensation of $543,388. PX1005 at 363. That offer also included $80,000 for a signing bonus and relocation expenses, PX1005 at 362, and tens of thousands of dollars of bonus potential, *see* PX1005 at 364. In late 2024, Plaintiff was informed that this employment opportunity would not move forward. Tr. 382:3-11 (Mostafa).

Plaintiff now works full-time as an attending surgeon at MetroHealth Medical Center in Cleveland, Ohio. Tr. 353:2-6 (Mostafa). In that position, he makes $375,000 annually and does not hold an academic appointment. Tr. 391:1-10 (Mostafa); Tr. 389:8-23 (Mostafa). He began working for MetroHealth around December 2024. Tr. 382:3-24 (Mostafa).

## CONCLUSIONS OF LAW

"It is axiomatic that a settlement agreement is a contract. Equally settled is the principle that interpretation of the terms of a contract is a question of law." *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988). To state a valid claim for breach of contract, a plaintiff must show: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The parties do not dispute that the Settlement Agreement was a valid contract, so this case turns on the questions of duty, breach, and causation of damages.

"Contract interpretation begins with the plain language of the agreement." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). The Court "must interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). If a contract's terms are "clear and unambiguous," the Court "may not resort to extrinsic evidence to interpret them." *Id.* "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *A-Transp. Nw. Co. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994). "However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause." *ViroMed Lab'ys, Inc. v. United States*, 62 Fed. Cl. 206, 215 (2004) (citing *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972)).

To show a breach, Plaintiff "must show material non-compliance by the agency with the terms of the settlement agreement." *Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007). "A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract." *Thomas v. Dep't of Hous. & Urb. Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997). To obtain damages, Plaintiff must show: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

Plaintiff's First Amended Complaint alleges that the VA breached the Settlement Agreement by: (1) failing to convene the June Committee Meeting pursuant to the terms of the Settlement Agreement and subsequently reporting negative information to the NPDB; and (2) failing to provide required employment verifications. *See* ECF 11 ¶¶ 35-36, 57, 60, 73-74; ECF 33 at 8-9. The Court addresses these allegations in turn.

### I.    Alleged Breaches Regarding the June Committee Meeting

Plaintiff alleges two procedural defects with the June Committee Meeting: (1) that non-voting guests attended and participated in the meeting, and (2) that documents Plaintiff sent to Christopher Cauley in March were not presented at the June Committee Meeting.

10

*See* ECF 33 at 3, 8-9; *see also* ECF 11 ¶¶ 35, 57, 75. And for the first time in post-trial briefing, Plaintiff argues that the Section Chiefs should have been invited to the June Committee Meeting. ECF 87 at 11.

The Settlement Agreement contains little detail on what the Committee Meeting would require. The only provision regarding the Committee, Section I(2), reads:

> I. The Agency hereby agrees as follows:
>
> …
>
> 2. The Agency agrees that it will convene the Clinical Executive Committee ("CEC") on (insert date) [sic] for the sole purpose of having it vote on the restoration of privileges for Mostafa. The makeup of the CEC for this purpose will be the normal voting members. Mostafa will be permitted 15 minutes to speak to the CEC prior to said vote. Mostafa understands that the Agency does not control the outcome of this vote, is not guaranteeing any result and that Mostafa waives any right to any cause of action (pursuant to II (1) below) as to the outcome of said vote.

JX8 at 1636. This provision creates three requirements for the convened Committee: (1) the CEC will have "the sole purpose of … vot[ing] on the restoration of privileges for Mostafa," (2) "[t]he makeup of the CEC for this purpose will be the normal voting members," and (3) "Mostafa will be permitted 15 minutes to speak to the CEC prior to said vote." JX8 at 1636. It is undisputed that the Committee was convened. And Plaintiff acknowledges that he was given 15 minutes to speak. Tr. 412:23-24 (Mostafa). Therefore, Plaintiff's claim for explicit violation of the terms of the Settlement Agreement boils down to three complaints: (1) that the attendance and participation of non-voting guests changed the "makeup of the CEC," (2) that Section Chiefs are "normal voting members" who should have been invited, and (3) that the Settlement Agreement required the Committee to consider Plaintiff's additional evidence before voting.

### A. Attendance and Participation of Non-Voting Guests

Plaintiff first argues that the presence of non-voting guests at the June Committee Meeting constituted a breach of the Settlement Agreement. ECF 33 at 10. The Court begins by analyzing the plain text of the Settlement Agreement. Notably, the plain language of the Settlement Agreement is silent as to guest attendance. Plaintiff claims that the relevant provision "was designed precisely to eliminate influence from the VISN and OGC." ECF 87 at 16. But nothing in the text reflects that interest, and nothing in the record indicates that such concerns were raised during negotiations on the terms of the Settlement

11

Agreement. To prohibit guests, the parties could have included a clear statement that guests could not attend—or at the very least could not participate.[3] They did not do so.

In the absence of an explicit prohibition on guests, the Court turns to the provision relating to the "makeup of the CEC." The Settlement Agreement requires that "[t]he makeup of the CEC … will be the normal voting members." JX8 at 1636. This sentence contains two potential ambiguities: the acronym "CEC" and the reference to "normal" voting members. Resolution of the first ambiguity defeats Plaintiff's claim about guest attendance. As used by the parties, the term "CEC" can refer to both the Clinical Executive Committee body and the meetings of that body.[4] If the Settlement Agreement limits the makeup of the *body*, then it places no limit on guest attendance, but if it limits the makeup of the *meeting*, then guest attendance could plausibly violate the Settlement Agreement. But the surrounding sentences clarify that the Settlement Agreement uses the term "CEC" to refer to the Committee body. The prior sentence explicitly identifies the acronym "CEC" as the "Clinical Executive Committee" and states that "*the* Clinical Executive Committee" will convene "for the sole purpose of having *it* vote." JX8 at 1636 (emphasis added). And the provision gives Plaintiff "15 minutes to speak *to the* CEC." JX8 at 1636 (emphasis added). These provisions only make sense if the term "CEC" refers to the Committee body, not the meeting. Therefore, Plaintiff's arguments concerning "the makeup of the CEC" are unavailing. The Court finds that the plain text of the Settlement Agreement does not appear to support Plaintiff's claim that the agreement barred guest attendance.

Nonetheless, the Court is mindful that "[b]efore arriving at a legal reading of a contract provision, a court must consider the context and intentions of the parties." *Metric*

---

[3] The Court takes seriously Plaintiff's concern about outside influence in the June Committee Meeting. Plaintiff has noted that VISN 10 employees played a significant role in the January Committee Meeting, and it is plausible that Plaintiff wished for a reconsideration of his privileges free from that kind of influence. But there is no indication that Plaintiff bargained for that term in the Settlement Agreement. *See Const., Inc. v. United States*, 203 Ct. Cl. 521, 530 (1974) ("The court must enforce a mutually agreed-upon contract *according to its terms*.") (citation omitted) (emphasis added). Furthermore, having reviewed the June Committee Meeting minutes, the Court finds that VISN 10 employees only participated in the early portion of the meeting to ask questions about the Settlement Agreement and implications of the Committee's future vote. *See* JX10 at 1813-14. Once the OGC lawyers finished their pre-meeting discussion, the only individuals who spoke in the meeting were Plaintiff and the voting members of the Committee. *See* JX10 at 1814-17. Neither the OGC lawyers nor VISN 10 employees were even present when Plaintiff addressed the Committee or the vote was taken. Tr. 90:16-24 (Schmidt). Accordingly, even though the Settlement Agreement did not impose the duty for which Plaintiff claims to have bargained, the Court finds that the June Committee Meeting was free of outside influence over the vote of the Committee.

[4] The dual meaning of the term "CEC" has been the core of the parties' dispute since the summary judgment stage. Though the parties never framed it in these terms, they have respectively insisted that their conflicting interpretations comport with the clear, unambiguous text of the Settlement Agreement. *See* ECF 20 at 20-21; ECF 24 at 12-13. They have repeated these claims in post-trial briefing. *See* ECF 87 at 11; ECF 88 at 21-24. It is clear to the Court from many witnesses' testimony at trial that the common usage of "CEC" refers roughly equally to both the Committee and its meetings (i.e., *the* CEC, versus *a* CEC).

12

*Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). The Federal Circuit has explained:

> Trade practice and custom illuminate the context for the parties' contract negotiations and agreements. Before an interpreting court can conclusively declare a contract ambiguous or unambiguous, it must consult the context in which the parties exchanged promises. Excluding evidence of trade practice and custom because the contract terms are "unambiguous" on their face ignores the reality of the context in which the parties contracted. That context may well reveal that the terms of the contract are not, and never were, clear on their face. On the other hand, that context may well reveal that contract terms are, and have consistently been, unambiguous.

*Id.* To determine whether an ambiguity arose as well as how to resolve any such an ambiguity, the Court considers "evidence of trade practice and custom [a]s part of the initial assessment of contract meaning." *Id.*

Two facts persuade the Court that practice and custom permit the attendance of non-voting guests at the June Committee Meeting, resolving any ambiguity in favor of the Government. First, nothing in the Medical Center Bylaws expressly prohibits the inclusion of guests. Rather, the Bylaws explicitly allow for at least two categories of non-voting guests. *See* DX2002 at 329. Ex-officio non-voting members are permitted to attend Committee Meetings, and the Committee chairperson is empowered to invite "[o]ther facility staff … to serve as resources or attend committee meetings." DX2002 at 329. There is no evidence that the Settlement Agreement displaced these portions of the Bylaws.

And second, the Court finds it highly persuasive that non-voting guests attended all three of the Committee Meetings at issue in this case. Specifically, all three Committee Meetings were attended by Credentialing & Privileging staff to capture the minutes and by at least one VISN 10 employee. *See* JX2A at 439; JX3A at 412; JX10A at 1811; Tr. 37:14-18 (Schmidt). As the Court previously found, the record indicates that non-voting members regularly attended Committee Meetings in general, according to Schmidt and Dr. Matta—who organized every Committee Meeting and were responsible for inviting guests. *See* Tr. 36:8-37:11 (Schmidt); Tr. 131:25-132:4 (Matta); *see also* Tr. 253:10-20 (Cauley); JX2A at 439; JX3A at 412. *But see* Tr. 215:20-22 (Salwen); Tr. 312:23-313:4 (Mostafa). Therefore, the attendance of non-voting guests at the June Committee Meeting was entirely consistent with the Committee's general practice.

Interpreting the Settlement Agreement to exclude all non-voting members would lead to illogical results. *See McAbee*, 97 F.3d at 1435. For one, that interpretation would exclude the Credentialing & Privileging staff who regularly attend Committee Meetings to record the meeting minutes and document the recommendation to be sent to the Executive Director for approval. In addition, it would exclude attorneys from the VA Office of

13

General Counsel, depriving the Committee of legal advice. The availability of legal advice seems particularly important in this case, given that this Committee Meeting was convened according to the Settlement Agreement. The Court simply cannot countenance an interpretation of the Settlement Agreement that would have deprived the Committee of both its recordkeepers and its lawyers. Indeed, if the OGC lawyers had convened a meeting of the exact same attendees to explain the Settlement Agreement just 30 minutes in advance of the official Committee Meeting, there would be no argument that it was improper. Accordingly, the Court concludes that the Settlement Agreement did not impose a duty on the VA to exclude all non-voting guests. Therefore, the attendance of non-voting guests at the June Committee Meeting did not breach the Settlement Agreement.

### B. Failure to Invite Section Chiefs

For the first time in post-trial briefing, Plaintiff argues that the Settlement Agreement required all voting members listed in the Medical Center Bylaws to be invited to the June Committee Meeting. ECF 87 at 11. This argument flows from the second potential ambiguity mentioned above: the use of the term "*normal* voting members." JX8 at 1636 (emphasis added). Plaintiff argues that this term incorporates the Medical Center Bylaws' definition of voting members. *See* ECF 87 at 11. The Government argues that this term incorporates the regular practices of the Committee, including the practice of not inviting Section Chiefs to Committee Meetings for practitioners outside of their Section. *See* ECF 88 at 21. As before, the Court turns to practice and custom to determine the best reading of this term.

Based on the normal practices of the Committee and its Chair, Dr. Matta, the Court concludes that the Government's reading is most reasonable. The Medical Center Bylaws list several Section Chiefs as "voting members." DX2002 at 328. But in practice, a Section Chief is only invited when one of their providers is the subject of a particular Committee Meeting. Tr. 176:7-24 (Matta); 179:17-180:22 (Matta). Against this backdrop, the phrase "normal voting members" would seem to invoke the Committee's *normal* practice of not inviting every single voting member to every Committee Meeting. Indeed, Plaintiff's argument—that all Section Chiefs should have been invited—would make more sense if the Settlement Agreement omitted the word "normal." Plaintiff's position could also have been more clearly stated in the Settlement Agreement if it required the votes of "all voting members listed in the Medical Center Bylaws." Because the Committee's normal practice is to invite Chiefs of Staff, and all Chiefs of Staff were invited to the June Committee Meeting, the Court finds that there was no breach of the Settlement Agreement relating to convening the "normal voting members."

### C. Failure to Distribute and Consider Certain Evidence

Plaintiff also argues that the VA breached the Settlement Agreement by not considering certain evidence at the June Committee Meeting. ECF 33 at 10-11. Specifically, in March 2023, Plaintiff provided Christopher Cauley with medical records that allegedly directly rebutted the allegations of substandard care. *See* Tr. 341:18-342:5

14

(Mostafa). Plaintiff believed that these documents should have been shared with the Committee in advance of the June Committee Meeting. *See* Tr. 336:22-337:19 (Mostafa); 341:4-342:2 (Mostafa). The Settlement Agreement is silent about the presentation of evidence at the June Committee Meeting. *See* JX8 at 1636. Plaintiff's argument fails at the outset because the Settlement Agreement places no evidence-related duty on the Committee. The Court "cannot insert words into the contract that the parties never agreed to." *Anchorage v. United States*, 123 F.4th 1315, 1320 (Fed. Cir. 2024) (citing *George Hyman Const. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987)). But Plaintiff's contemporaneous actions also defeat his argument.

First, Plaintiff did not submit any evidence to Rebecca Schmidt to be circulated before the June Committee Meeting. Before a Committee Meeting, the Credentialing & Privileging Manager would generally circulate an evidence file and any documents submitted by the provider. Tr. 158:18-159:3 (Matta); Tr. 41:7-14 (Schmidt). Plaintiff is aware of this practice, as he submitted evidence to Schmidt before the January Committee Meeting. *See* Tr. 41:2-6 (Schmidt). Dr. Matta testified that no evidence file was prepared and circulated for the June Committee Meeting, because the evidence file was the same as the file circulated for the January Committee Meeting, and thus had already been shared with the Committee.[5] Tr. 141:8-142:10 (Matta). Cauley testified that it is the provider's burden to submit for circulation any additional documents he or she wishes the Committee to consider. Tr. 248:5-11 (Cauley). Schmidt testified that she neither received nor circulated any documents to be considered as evidence at the June Committee Meeting. Tr. 97:9-14 (Schmidt). In March 2023, Plaintiff provided Cauley with documents and records he believed had not been shared at the January Committee Meeting. Tr. 336:22-337:6 (Mostafa). Cauley understood Plaintiff to be providing him with those documents in relation to his potential removal from employment, separate from the privilege revocation process. Tr. 242:21-243:5 (Cauley). Plaintiff did not ask Cauley to circulate the documents to the June Committee Meeting voting members, nor did Plaintiff provide the documents to Schmidt or Dr. Matta in advance of the June Committee Meeting. Tr. 412:13-22 (Mostafa). The Court cannot agree with Plaintiff that sharing evidence with Cauley in March created an obligation for the Committee to consider that evidence at the June Committee Meeting.

Second, Plaintiff did not present any of those documents during his oral presentation at the June Committee Meeting. Tr. 412:25-413:2 (Mostafa). The Settlement Agreement explicitly granted Plaintiff 15 minutes to speak to the Committee. *See* JX8 at 1636. Even

---

[5] As the Court has previously noted, Dr. Louis Furicchia, Interim Assistant Chief of Staff for Diagnostic Radiology Service, was the only regular voting member to attend the June Committee Meeting but not the January Committee Meeting, from which he was excused. *Compare* JX10A at 1811 *with* JX3A at 412. Given that the evidence file would have been circulated in advance of the January Committee Meeting, *see* Tr. 158:18-159:3 (Matta), the Court assumes that Dr. Furicchia would have received the evidence file. But even if not, Dr. Furicchia was free to request the evidence file in advance of the June Committee Meeting, where he did vote.

if Plaintiff did not ask Schmidt to circulate the evidence in advance, he certainly had the opportunity to present or discuss that evidence at the June Committee Meeting. The record reflects that Plaintiff did not do so. *See* JX10 at 1814-15. The Court finds that the Settlement Agreement did not impose an evidence-related duty on the Committee. But even if it had, the Committee did not breach the Settlement Agreement by failing to consider evidence which Plaintiff never attempted to present.[6]

### D. Subsequent NPDB Report

Plaintiff's complaints about the NPDB report flow directly from his complaints about the June Committee Meeting. *See* ECF 11 ¶ 75. The Court, having concluded that the June Committee Meeting complied with requirements of the Settlement Agreement, declines to indulge Plaintiff's attempt to relitigate the substance of the information included in the NPDB Report. As the Court made clear throughout trial, Plaintiff's claims must be limited to procedural defects, not substantive ones, because Plaintiff waived his ability to challenge the substantive outcome of the Committee vote in the Settlement Agreement. *See* JX8 at 1637; Tr. 45:21-47:1 (Court). Plaintiff has not advanced any argument that the NPDB Report itself was procedurally defective, nor has Plaintiff identified any term of the Settlement Agreement that purports to constrain the Credentialing & Privileging Department's reporting obligations. Accordingly, the Court finds no breach related to the NPDB Report.

## II. Alleged Breach Regarding the VA's Employment Verification Obligations

In the First Amended Complaint, Plaintiff claims that the VA breached the Settlement Agreement when Chief of Human Resources Amanda Rosas directed a prospective employer to the Credentialing & Privileging Department. ECF 11 ¶¶ 73-74. At trial, Plaintiff's case-in-chief did not include any evidence about this alleged breach. In addition, this claim is absent from Plaintiff's post-trial briefs, as is any mention of Rosas, a Government witness. *See generally* ECF 87; ECF 89. Because Plaintiff did not meet his burden to prove the claim during his case-in-chief, and even considering the limited evidence brought in during Plaintiff's cross-examination of Rosas during the Government's case-in-chief, the Court finds for the Government on this claim.

The Settlement Agreement places the following obligation on the VA: "the Agency agrees to provide employment verification that includes (and is limited to) dates of employment, position title and salary, and the fact that he retired." JX8 at 1637. Plaintiff

---

[6] Plaintiff makes an additional argument that the structure of the Settlement Agreement "presuppose[s] a substantive evaluative process." ECF 87 at 13. But that is not correct. As Plaintiff points out, the Settlement Agreement "required the VA to convene a CEC composed of the normal voting members, provide Dr. Mostafa an opportunity to speak, and conduct a vote on the restoration of his privileges." ECF 87 at 13. It is telling that Plaintiff's own summary of the Committee's obligations does not mention reviewing any particular evidence. In providing Plaintiff the opportunity to present evidence and be heard—consistent with his insistence throughout trial that he believed *he* had evidence that would change the Committee's mind, *see, e.g.*, Tr. 341:18-342:2 (Mostafa)—the Settlement Agreement did not implicitly agree to more.

had the obligation to direct prospective employers to the Chief of HR. JX8 at 1637. HR Chief Rosas testified that she responded to at least two requests regarding Plaintiff. Tr. 456:24-457:7 (Rosas). The only evidence in the record which purports to be an employment verification request is an email from Dr. Rajav Datta of Mount Sinai. *See generally* PX1012. In Dr. Datta's initial email to Rosas, Dr. Datta wrote: "Dr. Mostafa has applied for a position with us and has shared his NPDB report, which was initiated at the VA. I would appreciate the opportunity to connect with you regarding his candidacy." PX1012 at 316. Rosas responded that she "can provide dates of employment, but cannot speak on behalf of his clinical tenure and skills while employed with the VA," and she asked if Dr. Datta wished to be put in contact with Credentialing & Privileging. PX1012 at 315. Rosas understood Dr. Datta to be requesting information that Credentialing & Privileging would provide. *See* Tr. 452:18-453:17 (Rosas). Ultimately, she forwarded Dr. Datta to Credentialing & Privileging, Tr. 458:22-24 (Rosas).

The Court finds no breach from Rosas' conduct. The Settlement Agreement requires the HR Chief to provide limited employment verifications when requested. JX8 at 1637. The terms of the Settlement Agreement limit the contents of that response. JX8 at 1637. When the HR Chief receives a request that is not an employment verification request, the Settlement Agreement places no limitation on their conduct. *See Anchorage*, 123 F.4th at 1320 (noting that the Court "cannot insert words into the contract that the parties never agreed to") (citation omitted). Here, Rosas sought to clarify Dr. Datta's request and ultimately forwarded Dr. Datta to Credentialing & Privileging. Tr. 458:22-24 (Rosas). Given that Mount Sinai subsequently sought and obtained an affiliation verification from Credentialing & Privileging, *see generally* JX15, the Court infers that Rosas was correct in her decision to clarify Dr. Datta's request. This conclusion is further supported by the fact that the record contains no evidence that Dr. Datta followed up to request employment verification from Rosas. Thus, the only evidence in the record relating to an employment verification seems to have actually been a request for an *affiliation* verification. Rosas did not breach the Settlement Agreement by responding appropriately to an affiliation verification request that should have been directed to Credentialing & Privileging. Based on the lack of any other evidence in the record on the VA's alleged breach of Section I(4) of the Settlement Agreement, the Court finds no breach.

### III.    Plaintiff's Failure to Prove the VA's Actions Caused His Damages

Even if Plaintiff had proven a breach of the Settlement Agreement, he failed to prove that any alleged breach caused the damages he claims. On the stand at trial, Plaintiff—the only witness to testify to damages—gave a candid assessment of his damages claim: "I really cannot give a money number…. I'm here for the truth." Tr. 419:7-13 (Mostafa). To the extent Plaintiff's limited claim for relief in this case is for money damages, not truth, he must show "the breach is a substantial causal factor in the damages," and show the damages "with reasonable certainty." *Indiana Michigan Power*, 422 F.3d at 1373. Plaintiff has satisfied neither requirement.

17

In support of his damages claim, Plaintiff provided evidence of two employment offers he says were rescinded, one from Southern Illinois Medical Services and one from the University of Connecticut.[7] Tr. 381:24-382:11, 388:9-16 (Mostafa). He provided an unsigned, unexecuted employment agreement between himself and Southern Illinois as well as a letter from the Southern Illinois Credential Committee declining to approve his request for membership and privileges. *See* PX1005. With respect to his University of Connecticut offer, he provided a copy of his May 2023 employment offer. *See* PX1006. He also testified that he lost his positions at Detroit VAMC and Wayne State University, though Plaintiff's retirement from Detroit VAMC was a term of the Settlement Agreement. JX8 at 1636; Tr. 391:17-20 (Mostafa); Tr. 362:6-15 (Mostafa). Plaintiff has failed to connect the losses of both his employment offers and positions to the alleged breaches of the Settlement Agreement. It may well be that Plaintiff did not get future opportunities because his privileges had been revoked, but the Court has no first-hand testimony or other admissible evidence to that fact, beyond Plaintiff's own speculation. As the Government pointed out in its Rule 52(c) presentation, the prospective employers could have reached their decisions for a wide range of reasons, including public reporting unrelated to the Settlement Agreement. *See* Tr. 430:13-431:5 (Lewis). Presented only with the bare facts that the offers were revoked, the Court concludes that Plaintiff has not met his burden of proof on the issue of causation. *See Indiana Michigan*, 422 F.3d at 1373.

Plaintiff has also failed to prove damages with reasonable certainty. The Court knows Plaintiff's Detroit VAMC salary, JX5 at 3308 (Box 12); his current MetroHealth salary, Tr. 391:1-10 (Mostafa); and the compensation terms of the two employment offers discussed above, PX1006 at 372, PX1005 at 363-366. Plaintiff also testified that he earned approximately $200,000 in a per diem role for Beaumont Health Systems between March 2023 and July 2024. Tr. 418:13-19 (Mostafa). From the beginning, Plaintiff's theory of recovery has been unclear, as he has never stated a specific amount of damages claimed. A theory of recovery based on the revoked employment offers is entirely speculative and would lead to an uncertain amount in damages. Would the Court grant Plaintiff the difference between the higher revoked salary and his MetroHealth salary, in perpetuity? Plaintiff has not articulated his theory of damages with reasonable certainty, and the trial record does not support a coherent theory of damages, let alone one with reasonable certainty. Accordingly, the Court further concludes that Plaintiff has not met his burden of proof on the reasonable certainty of damages.[8] *See Indiana Michigan*, 422 F.3d at 1373.

---

[7] Plaintiff testified about the existence and recission of a third employment offer with Rush University Medical Center, but he provided no evidence or testimony about the terms of that agreement. *See* Tr. 364:2-365:5 (Mostafa). Therefore, the Court excludes this alleged agreement from its discussion of damages.

[8] Plaintiff argues that the Court could award nominal damages if Plaintiff has not proven damages with sufficient certainty. ECF 87 at 10. Because the Court has found against Plaintiff on his breach claims, the Court declines to address the question of nominal damages. *See Hubbard v. United States*, 480 F.3d 1327, 1331 (Fed. Cir. 2007) ("'Nominal damages' ordinarily are awarded where, although the plaintiff has established the merits of his claim, he has not shown any actual damages.").

19

## CONCLUSION

For the foregoing reasons, the Clerk is **DIRECTED** to enter judgment for the Government.

**IT IS SO ORDERED.**


PHILIP S. HADJI
Judge